1  Aaron K. Johnstun, UBN 13070
   JOHNSTUN LAW, LLC
2  1443 South 550 East
   Orem, Utah 84058
3  Office: (888) 860-0870
   Fax: (801) 471-2793
4  aaron@johnstunlaw.com

5  Attorneys for Plaintiffs

___ FILED      ___ LODGED
___ RECEIVED   ___ COPY

      OCT   1 2012

CLERK U S DISTRICT COURT
    DISTRICT OF ARIZONA
BY_____ DEPUTY

6              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ARIZONA

7

8  NLABS S.A. de C.V., a company formed )       CV 12-02081-PHX-GMS
   under the laws of Mexico; and David Bird, )
   an individual,                          )
9                                          )       COMPLAINT
                                           )
            Plaintiffs,                     )
10                                         )       (Jury Demand)
   v.                                      )
11                                         )
   FreeLife International, Inc., a corporation )
12 registered and doing business in Arizona, )
                                           )
13          Defendant.                      )
                                           )
14 _____)

15      Plaintiffs, NLABS S.A. de C.V. and David Bird, by undersigned counsel, bring this

16 civil action praying for relief upon the claims and damages averred.herein.

17                            *Parties & Agents*

18      1. The plaintiff NLABS S.A. de C.V. ("NLABS") is a company organized in the United

19 Mexican States with its principal place of business located at 2da Privada Prolongacion

20 Begonia No. 1, Colonia Granjas, Cuernavaca, Morelos, MEXICO C.P. 62460.

21      2. The plaintiff David Bird ("Bird") is a citizen of the United States of America and an

22 officer and controlling shareholder of NLABS.

23      3. Defendant FreeLife International, Inc. (or "FreeLife Inc.") is a for profit corporation

24 with its domestic registration in Connecticut and subsequent foreign registration in

25 Arizona. FreeLife Inc.'s principal place of business is 4950 S. 48th Street, Phoenix,

26 Arizona 85040. FreeLife Inc. was formerly known as Goji Global Inc., FreeLife

1 | International LLC, and FreeLife International Holdings LLC.

2 | 4. Empresa FreeLife Goji, S. de R.L. de C.V. ("EmpresaMex") is FreeLife Inc.'s
3 | Mexican alter ego and/or subsidiary formed in 2006.

4 | 5. FreeLife de Mexico, S. de R.L. de C.V. ("FreeLife Mex") is FreeLife Inc.'s Mexican
5 | alter ego and/or subsidiary formed in 2006.

6 | 6. Raymond J. Faltinsky ("Faltinsky") is a current director, officer and controlling
7 | shareholder for FreeLife Inc., owns property or assets within Arizona, conducts
8 | business within and is domiciled in Arizona.

9 | 7. Kevin F. Fournier ("Fournier") is a current director, officer and controlling
10 | shareholder for FreeLife Inc., owns property or assets within Arizona, conducts
11 | business within and is domiciled in Arizona.

12 | 8. Luke Taffuri ("Taffuri") is a current director, officer and controlling shareholder of
13 | FreeLife Inc., owns property or assets within Arizona, conducts business within and is
14 | domiciled in Arizona:

15 | 9. Earl Lawrence Mindell, Ph.D. ("Mindell") is a former director, officer, controlling
16 | shareholder, executive spokesman and agent for FreeLife Inc. from 1995 through 2008.

17 | 10. Jose Zapata ("Zapata") is an executive, manager, employee and/or agent for
18 | FreeLife Inc. from 2007 to the date of this complaint.

19 | 11. Ruben Lopez ("Lopez") is an executive, manager, employee and/or agent for
20 | FreeLife Inc. from 2007 to the date of this complaint.

21 | 12. Tom Bergman ("Bergman") is an executive, manager, employee and/or agent
22 | for FreeLife Inc. from 2007 to the date of this complaint.

23 | 13. Armando Berrones ("Berrones") is an executive, manager, employee and/or
24 | agent for FreeLife Inc. from 2007 to the date of this complaint.

25 | 14. Maria Mendez ("Mendez") is an executive, manager, employee and/or agent for
26 | FreeLife Inc. from 2007 to the date of this complaint.

- 2 -

15.  Karen Malley ("Malley") is an executive, manager, employee and/or agent for FreeLife Inc. from 2007 to the date of this complaint.

16.  Manuel García Barragán M. ("Barragán") is an incorporator of EmpresaMex, and Mexico legal counsel and agent for FreeLife Inc. from 2006 to the date of this complaint.

17.  Benjamin Thibaudeau ("Thibaudeau") is an executive with power of attorney for EmpresaMex and executive for FreeLife since 2006 to date.

### Jurisdiction & Venue

18.  This Court ·has subject-matter jurisdiction over the claims of this lawsuit pursuant to 28 U.S.C. § 1332.

19.  This Court has personal jurisdiction over all of the parties.

20.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1).

### General Allegations

21.  Defendant operates a multi-level marketing company headquartered in Phoenix, Arizona.

22.  Defendant's featured product is "Himalayan Goji Juice" ("HGJ") which purports to offer natural homeopathic and preventive medicine qualities.

23.  Defendant exports HGJ from the United States to Australia, New Zealand, Canada, Mexico, Singapore, Brunei, Thailand, Philippines and Hong Kong using local importers.

24.  Once imported through local importers, HGJ is then sold through Defendant's local distributors and downline marketers (a/k/a "multi-level marketing").

25.  NLABS is a Mexican importer specializing in importing and distributing "dietary supplement" products.

26.  On or about October 2003, Defendant approached NLABS to be its exclusive Mexican importer of HGJ under a "dietary supplement" tariff classification.

- 3 -

1  27. Prior to approaching NLABS in 2003 (from 1995 to 2007), Defendant engaged a

2  Canadian-American nutritionist named Earl Lawrence Mindell, Ph.D. ("Mindell") to

3  advocate the homeopathic and preventive medicine properties and benefits of HGJ as a

4  "dietary supplement." Defendant engaged Mindell as its executive public spokesman

5  and marketing agent for HGJ. Defendant through Mindell claimed—based on a

6  purported credible medical study—that HGJ as a "dietary supplement" inhibited cancer

7  cell growth. Defendant engaged Mindell as its public spokesman and marketing agent

8  until roughly winter 2007 when the medical study Defendant and Mindell cited as

9  evidence for their claim HGJ as a "dietary supplement" offered homeopathic and

10  preventive medicine was discredited within the medical community.

11  28. In attempting to engage NLABS as its exclusive Mexican importer for HGJ,

12  Taffuri on behalf of Defendant presented NLABS with a "Certificate of Free Sale" dated

13  November 18, 2003 based on an actual inspection by New Jersey's Department of

14  Health and Senior · Services occurring on February 21, 2001 certifying that the

15  Defendant's manufacturing facilities where HGJ was produced were in compliance with

16  "*food/dietary supplement*" regulations for good manufacturing practices.

17  29. On November 3, 2003, Defendant signed and notarized a "Sole Importer

18  Appointment" appointing NLABS as the sole importer of HGJ and authorizing NLABS to

19  register the product with Mexican authorities as needed for importation.

20  30. The "Sole Importer Appointment" dated November 3, 2003 states that NLABS'

21  appointment and authority would remain in effect until rescinded in writing by

22  Defendant.

23  31. In attempting to induce NLABS as its exclusive Mexican importer for HGJ,

24  Taffuri lead NLABS to believe HGJ was classified as a dietary supplement by

25  presenting NLABS with a "Certificate of Free Sale" dated February 21, 2001 certifying

26  Defendant's manufacturing facilities in which HGJ was produced were in compliance

- 4 -

with "food/*dietary supplement*" regulations. Defendant in order to lead NLABS to believe HGJ was a "dietary supplement" forwarded marketing literature and product information referring to Mindell's background in "dietary supplements" and his nutritional studies regarding HGJ's homeopathic and preventive medicine benefits. Such information in 2003 claiming HGJ was a "dietary supplement" was further published on Defendant's website.

32. On January 13, 2004, after NLABS' first successful importation of HGJ on January 7, 2004 under a "dietary supplement" tariff classification, NLABS was officially engaged as Defendant's exclusive Mexican importer of HGJ by formalizing an "International Importer Agreement" ("Contract").

33. The Contract, and letters of appointment letters signed by Defendant functioned to authorize NLABS to act as Defendant's exclusive importer of HGJ in Mexico.

34. Among the material terms included in the Contract and engagement of NLABS as the exclusive importer of HGJ was the requirement for Defendant to pay all duties and/or value added tax ("VAT") assessed by the Mexican government for the importation of HGJ into Mexico. As compensation for acting as the intermediary importer of HGJ for Defendant, NLABS was to receive from Defendant an overall net fee of $4.00 (or roughly 2.8%) per case of HGJ it imported. Once imported, Defendant then sold HGJ through its local Mexican distributors. NLABS net fee assumed Defendant paid all duties and/or VAT, if any, resulting from the importation of HGJ. (Consistent with the foregoing, in 2004 Defendant paid all VAT assessed on two occasions as a result of Mexico's Ministry of Health ("COFEPRIS") temporarily reclassifying HGJ as a "fruit juice.")

35. At the time of engaging NLABS as its exclusive Mexican importer, Defendant provided NLABS with HGJ's original label (prominently bearing the words "Dietary Supplement" and "Supplement Facts"), and a notarized Manufacturer's Certificate of

1  Analysis with HGJ's Brix and original formula indicating HGJ fell under a "dietary
2  supplement" international classification.

3  36. Submitting HGJ's product information provided by Defendant to COFEPRIS,
4  HGJ was initially classified by COFEPRIS as a "dietary supplement" for VAT/tariff
5  purposes in December 2003.

6  37. Classified as a "dietary supplement" by COFEPRIS based on the factual
7  information supplied by Defendant, HGJ was not assessed any VAT upon importation
8  into Mexico by NLABS.

9  38. According to representations by Defendant, the basic ingredients of HGJ are
10  manufactured in such a way so as to qualify as a product "originating" within the United
11  States of America under guidelines set forth by the North America Free Trade
12  Agreement ("NAFTA") thereby receiving additional favorable tariff classification with
13  U.S. Customs and Mexican Customs.

14  39. On June 10, 2004, COFEPRIS without warning declared HGJ was incorrectly
15  classified as a "dietary supplement" and instead was correctly classified as a "fruit
16  juice."

17  40. NLABS immediately appealed this decision by resubmitting Defendant's
18  Certificate of Origin certifying HGJ was a "dietary supplement," original label (which
19  prominently bore the words "Dietary Supplement" and "Supplement of Facts"), Brix and
20  original formula. NLABS succeeded in its appeal confirming HGJ was correctly
21  classified as a "dietary supplement."

22  41. NLABS continued to import HGJ for Defendant through 2007 as a "dietary
23  supplement" without any VAT assessed upon importation.

24  42. In April 2007, Jose Zapata an agent and legal representative for Defendant
25  through EmpresaMex encouraged Defendant to reapply for COFEPRIS to reclassify
26  HGJ as a "fruit juice" in order to take advantage of a new tariff incentive.

- 6 -

43. NLABS adamantly objected to Defendant reapplying to COFEPRIS for reclassification because it was unnecessary, HGJ had a favorable zero VAT assessment as a "dietary supplement classification, it had already been settled HGJ was correctly classified as a "dietary supplement" and any reclassification would unnecessarily trigger catastrophic *retroactive* VAT assessment and penalties against NLABS through no fault of its own.

44. On May 4, 2007, without NLABS' knowledge or consent, Defendant through Zapata and EmpresaMex submitted an application to COFEPRIS requesting HGJ be reclassified as a "fruit juice."

45. At the time·of the May 4, 2007 application to COFEPRIS, NLABS held a notarized designation as the exclusive Mexican importer of HGJ. As a result, Defendant directly infringed on NLABS' rights as the exclusive Mexican importer of HGJ.

46. On May 30, 2007, COFEPRIS, based on the original label (prominently bearing the words "Dietary Supplement"), Brix and original formula in which HGJ was originally classified by COFEPRIS as a "dietary supplement" denied Defendant's application (through Zapata and EmpresaMex) to have HGJ reclassified as a "fruit juice" leaving the "dietary supplement" classification intact.

47. On July 9, 2007, again without NLABS' knowledge or consent, Defendant using another Mexican division FreeLife Mex and Zapata approached Mexican Customs and requested Customers verify HGJ's classification as a "dietary supplement" be reevaluated stating that "other authorities had recently stated HGJ was incorrectly classified as a dietary supplement." In this letter, Defendant omitted disclosing COFEPRIS had just recently verified HGJ as a "dietary supplement" and the product information used by COFEPRIS to make such a determination.

48. Along with its July 9, 2007 application to Customs, Defendant through Zapata and FreeLife Mex submitted a bottle of HGJ (imported by NLABS in 2007 as a "dietary

1   supplement") and requested that Customs do an analysis to verify HGJ's classification

2   as a dietary supplement. To guarantee that Customs gave HGJ a "fruit juice"

3   classification rather than the "dietary supplement" classification that COFEPRIS had

4   confirmed two months earlier, Defendant fraudulently replaced the "dietary supplement"

5   label on the HGJ bottle with a "fruit juice" label. Then, to prevent Customs from

6   classifying HGJ as a non-originating fruit juice due to NAFTA's Annex 401, Defendant

7   submitted an altered master formula (on paper only) that represented that HGJ's 90%

8   non-originating juice ingredient (lycium barbarium from China) was 60% or less of

9   HGJ's total content. Customs' Brix analysis along with the altered master formula

10   misrepresented that Defendant added a greater amount of water than that needed to

11   rehydrate HGJ's concentrated juice ingredients back to their original form, and resulted

12   in Customs re-classifying HGJ as a non-alcoholic beverage (i.e. watered-down "fruit

13   juice") rather than a "fruit juice" as the fraudulently altered label submitted to Customs

14   for classification purposes suggested.

15   49. At the time of the July 9, 2007 application to Customs, NLABS continued to hold

16   a notarized designation from Defendant as the exclusive Mexican importer of HGJ. As a

17   result, Defendant's application to Mexican Customs directly infringed a second time on

18   NLABS' rights as the exclusive Mexican importer of HGJ.

19   50. Defendant's July 9, 2007 application to Mexican Customs through Zapata and

20   FreeLife Mex was made to Customs without disclosing COFEPRIS' recent decision and

21   included a fraudulently altered original label (omitting the words "Dietary Supplement"),

22   revised Brix and original formula.

23   51. Knowing they were submitting a reclassification request to Customs while

24   intentionally omitting disclosure of COFEPRIS' recent decision confirming HGJ's

25   classification as a "dietary supplement," and further knowing a reclassification of HGJ by

26   Customs would likely trigger financially catastrophic retroactive VAT assessment and

- 8 -

1   penalties against NLABS through no fault of its own, and despite NLABS' objections

2   against reclassification due to irreparable harm to NLABS, Defendant submitted a

3   misleading Certificate of Origin, fraudulently altered original label (prominently bearing

4   the words "Fruit Juices" for the first time instead of "Dietary Supplement"), revised Brix

5   and original formula to Customs on July 9, 2007 in effect seeking HGJ's reclassification

6   as a "fruit juice."

7   52. Defendant's altering HGJ's label, original formula and Brix submitted to

8   Customs on July 9, 2007 further constituted fraud on both U.S. Customs and Mexican

9   Customs since its main "non-originating" ingredient was altered from 90% to 60% or

10  less rendering HGJ a "non-originating" product for purposes of NAFTA while no NAFTA

11  tariff shift was made to reflect the "non-originating" change.

12  53. On July 20, 2007, Customs rejected Defendant's request to reclassify HGJ as a

13  "fruit juice" instead classifying it as a "non-alcoholic beverage."

14  54. On August 9, 2007, NLABS still without knowledge of Defendant's applications

15  to COFEPRIS and Customs, Defendant's Mexican lawyer Manuel García Barragán M.

16  circulated a memorandum detailing the benefits of reclassifying HGJ as a "fruit juice."

17  55. Barragán's August 9, 2007 memo reveals some of Defendant's motives to have

18  HGJ reclassified as a "fruit juice" despite NLABS' objections which included 1) taking

19  advantage of a new "fruit juice" incentive and 2) securing trademarks for HGJ as a

20  "juice" since the trademark for HGJ as a "dietary supplement" had been secured by

21  another entity.

22  56. Barragán's August 9, 2007 memo predicts substantial retroactive VAT

23  assessment and penalties by Mexico's Tax Administration Service ("SAT") if Defendant

24  succeeded in having HGJ reclassified as a "fruit juice."

25  57. Barragán's August 9, 2007 memo further expressly contemplates penalties

26  assessed by COFEPRIS and Customs if either agency discovered Defendant's

- 9 -

1 | inconsistent and contradictive applications and classifications.

2  58. On August 10, 2007, Berrones circulated a copy of Barragán's August 9, 2007
3  memo to NLABS, still unaware of Defendant's applications to COFEPRIS and Mexican
4  Customs.

5  59. Upon forwarding a copy of Barragán's August 9, 2007 memo to NLABS,
6  Defendant fraudulently omitted to disclose to NLABS the multiple applications to
7  COFEPRIS and Customs.

8  60. When questioned about the reclassification to "non-alcoholic beverage,"
9  Defendant through Taffuri informed NLABS that Customs' reclassification to "non-
10  alcoholic beverage" was a mistake deceptively leading NLABS to believe the "dietary
11  supplement" classification was still valid.

12  61. On August 10, 2007 and September 21, 2007, NLABS' owner and director
13  David Bird emailed Taffuri and other officers and managers of Defendant requesting
14  Defendant correct the classification or provide NLABS with the product information
15  submitted to Customs and power-of-attorney in order for NLABS to appeal Customs'
16  reclassification and expected resulting retroactive VAT assessment and penalties
17  against NLABS by SAT.

18  62. Defendant's efforts to reclassify HGJ as a "juice" instead of a "dietary
19  supplement" in January 2007 was further motivated by public relations damage control
20  in response to a medical study being publicly discredited in which Defendant and
21  company spokesman Mindell cited as a basis for their claims that HGJ used as a
22  "dietary supplement" offered homeopathic and preventative medicine benefits. In 2009,
23  a class action lawsuit was filed against FreeLife International, Inc. in 2009 (*Burge, et al.
24  v. FreeLife International, Inc.*, CV 09-1159, U.S. District Court for Arizona) alleging,
25  among other things, Mindell and Defendant knowingly and/or negligently
26  misrepresented HGJ's supposed homeopathic and preventive medicine benefits as a

- 10 -

1  "dietary supplement."

2  63.  With legal motive to reclassify HGJ from a "dietary supplement" to "juice" at any

3  cost, and fully aware a catastrophic retroactive VAT assessment against NLABS would

4  embargo NLABS from importing other products for other clients into Mexico, Defendant

5  without notice inexplicably dropped NLABS in January 2008 and began using

6  EmpresaMex and FreeLife Mex to import HGJ under the "non-alcoholic beverage"

7  classification.

8  64.  As late as March 12, 2008, knowing full well of its intentional actions to

9  reclassify HGJ, Defendant through Zapata sent an email to NLABS continuing to falsely

10  represent Defendant's actions as a "relabeling conflict" initiated by COFEPRIS.

11  65.  Based on Customs' reclassification of HGJ as a "non-alcoholic beverage" and

12  consistent with Barragán's opinion, SAT issued a resolution dated July 31, 2008

13  ("Resolution") against NLABS assessing retroactive VAT and penalties in the amount of

14  $39,052,674.16 pesos (MXN) (or about $2,963,918 USD).

15  66.  NLABS has since repeatedly alerted Defendant and its executives and agents

16  of SAT's outstanding Resolution, NLABS' accruing irreparable damages and made

17  demand that Defendant satisfy the Resolution.

18  67.  Defendant has willfully ignored NLABS' requests to indemnify by satisfying

19  SAT's Resolution.

20  68.  SAT's Resolution assessing VAT and penalties against NLABS and Defendants

21  refusal to pay such as contractually obligated has since resulted in seizure of NLABS'

22  assets; loss of all of NLABS' other import/export clients; inability for NLABS to acquire

23  new import/export clients; permanent damage to Plaintiffs' business reputation along

24  with NLABS' other owners, executives, shareholders and employees; Plaintiffs and

25  NLABS' other individual owners, executives, shareholders and employees being

26  permanently embargoed as importers in Mexico; and looming criminal charges and

1  incarceration of NLABS' individual owners, executives, shareholders and employees for

2  Defendant's wrongful actions.

3  69. While aware of NLABS' accruing irreparable damages and outstanding VAT

4  Resolution and penalties through no fault of its own, Defendants inexplicably dropped

5  NLABS as its importer without notice in January 2008.

6  70. While dropping NLABS without notice and leaving behind its VAT obligation for

7  NLABS to deal with, Defendant ensured HGJ's continued importation into Mexico under

8  the new (fraudulently obtained) "non-alcoholic beverage" tariff classification through

9  EmpresaMex and FreeLife Mex.

10  71. Despite a clear and unambiguous contractual obligation—supported by the

11  parties' course of dealing—to pay all VAT, duties and penalties assessed and indemnify

12  NLABS, and after NLABS has repeatedly informed Defendant on numerous occasions

13  through emails, letters and phone calls, Defendant fully aware of substantial damages

14  caused by SAT's July 31, 2008 Resolution has turned a blind eye and refused to

15  resolve (or otherwise indemnify NLABS) the VAT and penalties assessed against

16  NLABS caused by Defendant resulting in Plaintiffs' harm and damages averred herein.

17  **Claim I**

18  **(Breach of Contract)**

19  72. Plaintiffs incorporate and re-allege paragraphs 1-71 herein.

20  73. NLABS and Defendant (f/k/a FreeLife International LLC and Goji Global Inc.)

21  entered into a valid importer contract on or about January 12, 2004 ("Contract").

22  74. The Contract specifically contemplates and identifies HGJ as a product to be

23  imported as a "dietary supplement" product.

24  75. The Contract and letters of appointment designated NLABS as Defendant's

25  exclusive Mexican importer of HGJ. Subsequent letters of appointment were issued to

26  NLABS as the exclusive Mexican importer of HGJ on November 9, 2005 and again on

1  January 12, 2007.

2  76. The Contract, the parties' communications and course of dealing
3  unambiguously establish that Defendant was liable to pay or otherwise reimburse
4  NLABS for any tariff, duties or penalties assessed for the importation of HGJ into
5  Mexico by NLABS.

6  77. Pursuant to the Contract, Defendant warranted and represented Defendant had
7  the full right and authority to distribute HGJ through NLABS as a "dietary supplement"
8  without infringing on the intellectual property rights of any third party.

9  78. NLABS performed under the Contract at all times by lawfully securing the
10  necessary product tariff classification and at all times lawfully importing HGJ into Mexico
11  between January 2004 and January 2008.

12  79. Beginning in May 2007, Defendant through EmpresaMex and Zapata
13  unilaterally approached COFEPRIS unbeknownst to NLABS with an application to have
14  HGJ reclassified as a "fruit juice."

15  80. Unsuccessful, in July 2007 Defendant unilaterally approached Mexican
16  Customs unbeknownst to NLABS through FreeLife Mex and Zapata with a second
17  application to have HGJ reclassified as a "fruit juice."

18  81. Defendant's July 2007 application to Customs included a misleading altered
19  Certificate of Origin and fraudulently altered product label, Brix and master formula that
20  misrepresented HGJ's true formula.

21  82. Both the May 2007 application to COFEPRIS and July 2007 application to
22  Customs were done without NLABS' knowledge or consent.

23  83. Both applications violated NLABS' right as the exclusive Mexican importer of
24  HGJ and NLABS' reliance on the representation from Defendant it was the exclusive
25  Mexican importer of HGJ.

26  84. On July 9, 2007, using the misleading altered Certificate of Origin and

- 13 -

1  fraudulently altered product label, Brix and master formula, and unaware of COFEPRIS'

2  recent decision affirming HGJ as a "dietary supplement," Customs issued a resolution

3  which reclassified HGJ as a "non-alcoholic beverage."

4  85. On August 10, 2007, Berrones circulated a memorandum prepared by

5  Defendant's Mexican lawyer Barragán dated August 9, 2007 to NLABS, and among

6  other things, advising Defendant to continue pursuing a "fruit juice" classification and

7  incentive, advising Defendant of likely potential catastrophic retroactive VAT and

8  penalties upon reclassification, and negative consequences if COFEPRIS and Customs

9  became aware of inconsistent classifications.

10  86. Defendant deceptively mischaracterized Customs July 20, 2007 reclassification

11  as a "mistake" and continued to omit to NLABS Defendant's May 4, 2007 application to

12  COFEPRIS and July 9, 2007 application to Customs seeking to reclassify HGJ as a

13  "fruit juice."

14  87. On July 31, 2008, based on Customs July 20, 2007 reclassification of HGJ as a

15  "non-alcoholic beverage," SAT issued a resolution assessing retroactive VAT and

16  penalties against NLABS in the amount of $39,052,674.16 pesos (MXN) for the

17  importation of HGJ reclassified as a "non-alcoholic beverage."

18  88. Further, despite Defendant's representation that it held the full right and

19  authority to distribute HGJ through NLABS as a "dietary supplement" without infringing

20  on the intellectual property rights of any third party was false as another entity or

21  individual owned the intellectual rights to HGJ as a "dietary supplement" directly in

22  violation of Defendant's warranty and representation.

23  89. Defendant's actions to reclassify HGJ was especially motivated by damage

24  control in response to a medical study being discredited in which Defendant and Mindell

25  cited as a basis for the claim that HGJ as a "dietary supplement" possessed

26  homeopathic and preventive medicine properties.

- 14 -

90. Plaintiffs have on numerous occasions through email, letter and telephone communications timely alerted Defendant to SAT's retroactive assessment and penalties as early as May 2008.

91. Plaintiffs have on numerous occasions through email, letter and telephone communications timely demanded that Defendant satisfy SAT's outstanding retroactive assessment and penalties or indemnify Plaintiffs.

92. Despite knowledge of SAT's retroactive VAT and penalties assessment, Defendant has at all times willfully refused to satisfy SAT's outstanding $39,052,674.16 pesos (MXN) assessed for the importation of their product, HGJ.

93. As a result of Defendant's willful refusal to satisfy the VAT and penalties it triggered through unilateral and fraudulent applications to COFEPRIS and Customs, NLABS has had its assets seized, been embargoed and prevented by Mexican authorities from importing products into Mexico, lost its entire customer base and had its reputation irreparably damaged through no fault of its own.

94. The Contract between NLABS and Defendant includes an indemnity provision that in the event a party breaches any of its warranties and representations, that party agrees to defend and indemnify the non-breaching party, its officers, directors, shareholders, and employees from and against any and all losses, claims, damages, legal fees, obligations and expenses of any kind or description incurred by the non-breaching party and arising out of the breach.

95. About the same time SAT assessed retroactive VAT and penalties against Plaintiffs, Defendant inexplicably ceased using NLABs and began importing HGJ through EmpresaMex and FreeLife Mex.

96. Defendant's conduct, including, secret unilateral applications to COFEPRIS and Customs in violation of NLABS right as the exclusive importer of HGJ in Mexico, willful refusal to timely satisfy SAT's retroactive VAT and penalties assessed against NLABS,

1  failure to indemnify NLABS for duties and penalties assessed against NLABS, and

2  failure to mitigate NLABS's damages, constitutes material and ongoing breaches of the

3  parties' Contract.

4      97.  Defendant's breach of contract was intentional and calculated to harm Plaintiffs

5  or reckless and indifferent to the substantial harm its breach would foreseeably cause

6  Plaintiffs.

7      98.  Defendant's ongoing breach of contract has additionally and foreseeably

8  caused Plaintiffs to incur damages through lost profits, lost future profits, loss of

9  business, destruction of business, loss of goodwill and loss of business reputation.

10     99.  Defendant's ongoing breach of contract has caused NLABS irreparable damage

11  in an amount to be determined at trial not less than $18,381,540 (USD), excluding

12  interest, costs, punitive damages and reasonable attorney fees.

13                                        *Claim II*

14                    **(Breach of Covenant of Good Faith & Fair Dealing)**

15     100. Plaintiffs incorporate and re-allege paragraphs 1-99 herein.

16     101. The Contract between NLABS and Defendant contained an implied covenant of

17  good faith and fair dealing between the parties.

18     102. NLABS has at all times performed its obligations in good faith and fairly.

19     103. NLABS performance of its contractual duties by good faith and fair dealing has

20  not been reciprocated by Defendant.

21     104. Defendant's unlawful conduct described hereinabove constitutes a knowing and

22  intentional interference and violation of NLABS' rights as the exclusive Mexican importer

23  of HGJ.

24     105. Defendant's motivation to reclassify HGJ from a "dietary supplement" to a "fruit

25  juice" for damage control in response to a discredited medical study cited by Defendant

26  and Mindell was done with callous indifference to the catastrophic financial damages

1   (i.e. embargo from SAT and permanent loss of business) it would cause NLABS, its

2   owners, executives, managers, employees and Bird.

3   106. Defendant's conduct herein, including fraud and material omissions to

4   government agencies, was done with full knowledge of the substantial irreparable

5   damages it would inflict upon Plaintiffs and done without NLABS' knowledge or consent.

6   107. In addition to refusing to satisfy the retroactive VAT and penalties Defendant

7   caused to be assessed against Plaintiffs, Defendant has refused to cooperate in good

8   faith with NLABS to avoid and mitigate NLABS' and Bird's accruing damages.

9   108. Defendant's conduct herein was subversive and included manipulating and

10  deceiving multiple Mexican government agencies by submitting fraudulent product

11  information.

12  109. Defendant's aforementioned conduct was patently malicious as it ensured the

13  continued importation of HGJ through newly formed EmpresaMex and FreeLife Mex

14  while intentionally dropping NLABS and leaving behind the irreparable damages

15  Defendant had unnecessarily caused against NLABS through no fault of its own.

16  110. Defendant, and their agents, acted in a way intended to and actually interfered

17  with NLABS' ability to comply with Mexican Customs and other Mexican government'

18  agencies regulations.

19  111. Defendant's breach was intentional and calculated to harm Plaintiffs or reckless

20  and indifferent to the substantial harm its breach would foreseeably cause Plaintiffs.

21  112. Defendant's conduct as described above pertaining to breach of contract

22  constitutes bad faith, unfair dealing, malicious, or otherwise manifests a knowing and

23  reckless indifference toward, and ongoing willful disregard for NLABS' rights and

24  expected benefits under the Contract.

25  113. Defendant's ongoing breach of the covenant of good faith and fair dealing has

26  additionally and foreseeably caused the plaintiffs to incur damages through lost profits,

- 17 -

1  lost future profits, loss of business, destruction of business, loss of goodwill and loss of

2  business reputation.

3  114. Defendant's ongoing breach of the covenant of good faith and fair dealing has

4  caused NLABS irreparable damage in an amount to be determined at trial not less than

5  $18,381,540 (USD), excluding interest, costs, punitive damages and reasonable

6  attorney fees.

7                                          ***Claim III***

8                                       **(Negligence)**

9  115. Plaintiffs incorporate and re-allege paragraphs 1-114 herein.

10  116. Defendant and its affiliates, subsidiaries, executives, employees, and agents

11  held unique positions superior in nature, knowledge and control over its product HGJ,

12  HGJ's representations to Mexico government agencies for tariff classification purposes

13  and NLABS as their Mexican importer.

14  117. Defendant's superior nature, knowledge and control gave rise to a duty of care

15  owed to Plaintiffs and NLABS other owners, executives, managers and employees.

16  118. Using its superior position, knowledge and control, Defendant breached

17  its duty of care owed by negligently, recklessly and unnecessarily causing HGJ to be

18  erroneously reclassified from a "dietary supplement" to "non-alcoholic beverage"

19  classification by presenting HGJ to Mexican officials in an inaccurate or false light

20  without NLABS knowledge and consent.

21  119. Defendant's foregoing conduct factually and legally caused HGJ to be

22  erroneously classified triggering irreparable damages to NLABS, its owners, executives,

23  managers and employees by triggering retroactive VAT and penalties, seizure of its

24  assets, embargo of its ability to import other products into Mexico, and loss of clientele

25  against NLABS through no fault of its own.

26  120. Defendant's aforementioned conduct constitutes negligence, callous

- 18 -

1  indifference and gross recklessness.

2  121. Defendant's negligence, callous indifference and gross recklessness has

3  additionally and foreseeably caused the plaintiffs to incur damages through lost profits,

4  lost future profits, loss of business, destruction of business, loss of goodwill and loss of

5  business reputation.

6  122. Defendant's negligence and gross recklessness has caused Plaintiffs

7  irreparable damage in an amount to be determined at trial not less than $18,381,540

8  (USD), excluding interest, costs, punitive damages and reasonable attorney fees.

9  **Claim IV**

10  **(Fraudulent Misrepresentation)**

11  123. Plaintiffs incorporate and re-allege paragraphs 1-122 herein.

12  124. On May 4, 2007, Defendant through Zapata and EmpresaMex requested

13  COFEPRIS reclassify HGJ as a "fruit juice."

14  125. COFEPRIS identified HGJ as already being imported as a "dietary supplement"

15  by pointing out the discrepancies and incorrect representations in the application and

16  thereby rejecting Defendant's application on May 30, 2007.

17  126. Defendant's May 4, 2007 application was done without NLABS' knowledge or

18  consent and violated NLABS reliance as the exclusive Mexican importer of HGJ.

19  127. Following COFEPRIS' denial, on or about May 30, 2007, Defendant through

20  Zapata approached a man named Ruben Lopez to solicit his "gran amigo" in Mexican

21  Customs' laboratory to pursue the "fruit juice" classification with Customs.

22  128. On May 31, 2007, Lopez acting as the agent for Defendants through FreeLife

23  Mex sent an email to his "gran amigo" in Customs laboratory and requested this friend

24  render an informal opinion about the proper tariff classification of HGJ.

25  129. The May 31, 2007 email simply listed HGJ's ingredients and intentionally

26  omitted essential classifying characteristics including HGJ's master formula, Brix,

- 19 -

1   dietary supplement label reference, and COFEPRIS' May 30, 2007 classification of HGJ

2   as a "dietary supplement."

3   130. Lopez's email intentionally excluded the actual Brix, ingredients and label in

4   which HGJ had been imported since 2004 and used by COFEPRIS on three prior

5   occasions to classify HGJ as a "dietary supplement."

6   131. On June 1, 2007, Lopez' "gran amigo" in Customs based on the incomplete

7   information informally expressed his opinion HGJ was properly classified as a "fruit

8   juice."

9   132. On June 19, 2007, Defendant through an email from Zapata asked NLABS if it

10   was still importing HGJ as a "dietary supplement" indicating Defendant (erroneously)

11   believed dietary supplements were subject to VAT.

12   133. In another June 19, 2007 email from the Zapata, Defendant fraudulently

13   misrepresented to NLABS that it was not pursuing any reclassification of HGJ, but was

14   only concerned because "several authorities" had recently informed it HGJ was

15   misclassified.

16   134. On July 2, 2007, Defendant through an email from Bergman fraudulently

17   misrepresented to NLABS that EmpresaMex was merely having trouble securing

18   permits purposefully leading NLABS to believe that HGJ was appropriately imported as

19   a "dietary supplement" at the very time Defendant was attempting to secure a "fruit

20   juice" classification from Customs without NLABS's knowledge.

21   135. On July 2, 2007, Defendant through another email from Bergman asked NLABS

22   to process another importation shipment of HGJ under the "dietary supplement"

23   classification.

24   136. On July 9, 2007, Defendant through FreeLife Mex (in an attempt to conceal

25   from COFEPRIS and Customs the recent inconsistent applications for reclassification)

26   submitted another application containing even greater falsified product ingredients

- 20 -

1  percentages, Brix and label in order to obtain the desired "fruit juice" classification.

2  137. Defendant's falsified  July 9, 2007 application to Customs included:

3       a. Intentional omission of COFEPRIS' prior rulings (one less than six weeks

4          earlier) concerning HGJ;

5       b. Falsified master formula which fraudulently misstated the true ingredients

6          and percentages of HGJ in order to make it appear to have the

7          characteristics of a "fruit juice" product and NAFTA product origination; and

8       c. Falsified Spanish over-label and/or original label (different than its English

9          version), made specifically for the application.

10  138. Defendant's July 9, 2007 application was accompanied by a letter from Zapata

11  that fraudulently stated, among other things, that "several authorities told us that the

12  product [HGJ] was incorrectly classified."

13  139. On July 18, 2007, Defendant through an email from Berrones (Defendant's

14  Mexican Country Manager) informed NLABS, for the first time, of contact with

15  COFEPRIS in May. However, Defendant continued to conceal the exact nature and

16  details of its contact with COFEPRIS (i.e. reclassification).

17  140. The July 18, 2007, email from Berrones fraudulently misrepresented to NLABS

18  Defendant only sought verification of HGJ's "dietary supplement" classification and had

19  not attempted to apply for a "fruit juice" reclassification from COFEPRIS.

20  141. On July 18, 2007, NLABS sent an email to Defendant requesting that it change

21  the fruit juices classification on Defendant's invoices, etc. to dietary supplement so that

22  COFEPRIS and/or Customs would not incorrectly classify HGJ.

23  142. On July 20, 2007, Customs issued a ruling to FreeLife Mex reclassifying HGJ

24  as a "non-alcoholic beverage" thereby rendering HGJ subject to VAT upon importation.

25  143. On this same day, Defendant through Mendez (Defendant's Global Support

26  Manager) sent another email to NLABS, without disclosing Customs' ruling, and

- 21 -

1   fraudulently misrepresented to NLABS that "corporate" wanted NLABS to write Customs

2   a letter as well as submit COFEPRIS' resolutions to explain HGJ's dietary supplement

3   classification.

4   144. Fully aware of Customs' July 20, 2007 "non-alcoholic beverage" reclassification

5   Defendant nonetheless continued importing HGJ through NLABS using the "dietary

6   supplement" classification.

7   145. On August 9, 2007, a memorandum prepared by Barragán addressed the

8   situation and concluded Defendant could still take advantage of the new "fruit juice"

9   incentive through Customs' recent "non-alcoholic beverage" classification.

10   146. Barragán's August 9, 2007 memorandum explained that Defendant could

11   always import HGJ as a "dietary supplement" since that is what it is considered in the

12   U.S. and NLABS had been doing so in Mexico for years.

13   147. Among the individual recipients "cc'd" on Barragán's August 9, 2007

14   memorandum was Thibaudeau for Defendant.

15   148. On August 10, 2007, Defendant forwarded by email to NLABS a copy of the

16   July 20, 2007 resolution informing NLABS for the first time that Customs had

17   reclassified HGJ as a "non-alcoholic beverage" and that NLABS might be required to

18   explain its importations as a "dietary supplement."

19   149. On August 10, 2007, Defendant also forwarded by email to NLABS a copy of

20   Barragán's August 9, 2007 memorandum. Again, Defendant continued to characterize

21   Customs' July 20, 2007 resolution as a mistake and concealed that it was Defendant

22   who had initiated contact with Customs proactively seeking a reclassification without

23   NLABS' knowledge.

24   150. On August 10, 2007, NLABS sent Defendant an email demanding they correct

25   Customs' July 20, 2007 resolution (which Defendant continued to represent to NLABS

26   was a mistake) by presenting documentation to Customs HGJ's product description,

- 22 -

1  label, Brix and COFEPRIS' past resolutions classifying HGJ as a "dietary supplement."

2  151. After that time through numerous emails, letters or telephone calls, Defendant

3  continued to fraudulently misrepresent to NLABS it was only having import permit

4  issues and asked NLABS to import an August 17, 2007 shipment under the "dietary

5  supplement" classification.

6  152. By emails from Bergman, Defendant on July 25, 2007 and on September 26,

7  2007, additionally sent instructions to NLABS to process HGJ shipments under the

8  "dietary supplement" classification.

9  153. Between June 2007 and January 2008, while fully aware of their efforts to

10  reclassify HGJ and the likely retroactive VAT assessment it would cause, Defendant

11  used NLABS to import three additional shipments of HGJ using the "dietary supplement"

12  classification because its EmpresaMex and FreeLife Mex were not yet approved to

13  import HGJ into Mexico.

14  154. On September 21, 2007, NLABS demanded that Defendant fix what Defendant

15  had represented as a simple classification "error" and forward NLABS certified copies of

16  documents needed to correct the misclassification.

17  155. On September 25, 2007, Defendant through correspondence to NLABS from

18  Malley and Mendez fraudulently misrepresented to NLABS that it wished to correct what

19  Defendant characterized as a classification "error" by Customs. However, after making

20  that representation, Defendant completely discontinued communication on the subject

21  and refused to forward NLABS copies of certified documents Defendant submitted to

22  Customs on July 20, 2007 and powers necessary for NLABS to correct the classification

23  issue with Customs. ·

24  156. On September 26, 2007, still not yet informed of Defendant's intentional fraud,

25  Defendant requested NLABS secure import permits for an importation of HGJ as

26  "dietary supplement."

1  157. Defendant again supplied NLABS with documents representing HGJ fell under

2  the "dietary supplement" classification.

3  158. On November 5, 2007, in response to NLABS' request for Brix information,

4  Defendant through Bergman purposely omitted the requested Brix necessary to

5  reconstitute HGJ's juice ingredients back to their original state and otherwise enabling

6  NLABS to refute Customs' "non-alcoholic beverage" classification (and ultimately avoid

7  SAT's 2008 Resolution against NLABS). The requested Brix information would have

8  confirmed COFEPRIS' most recent "dietary supplement" verification by eliminating the

9  "non-alcoholic beverage" as a possible classification for HGJ since concentrated juices

10 that are reconstituted back to their original state (i.e. juices that are not watered-down)

11 cannot be classified as non-alcoholic beverages. With the "non-alcoholic beverage"

12 classification eliminated as a possibility, Customs using the correct product information

13 could only have confirmed HGJ as a "dietary supplement" classification as COFEPRIS

14 did in May 2007.

15 159. On November 12, 2007, Defendant through EmpresaMex applied to Customs

16 for a VAT exemption for HGJ under Defendant's "non-alcoholic beverage" classification

17 obtained through Customs.

18 160. After Customs' parent agency (SAT) implied that the exemption could not be

19 granted to previous importations, Defendant imported its first shipment through

20 EmpresaMex, using the "non-alcoholic beverage" classification on December 11, 2007.

21 161. At the same time, December 11, 2007, Defendant obtained a VAT exemption

22 from SAT for EmpresaMex for HGJ under the "non-alcoholic beverage" classification

23 obtained by FreeLife Mex through Customs.

24 162. In January 2008, Defendant dropped NLABS and began importing HGJ through

25 EmpresaMex and FreeLife Mex under a "non-alcoholic beverage" classification and

26 VAT exemption obtained from SAT.

- 24 -

1     163. From May 2007 to January 2008, Defendant while fraudulently misleading

2   COFEPRIS and Customs, omitted to disclose its intent to reclassify HGJ and further led

3   NLABS into believing the reclassification as a "non-alcoholic beverage" was an error

4   that Defendant would in good faith work with NLABS to correct.

5     164. On March 12, 2008, Zapata sent an email on behalf of Defendant indicating that

6   NLABS "will be questioned regarding the classification under which NLABS imported

7   the product in the past" and continuing to represent its actions as a "relabeling conflict"

8   initiated by COFEPRIS knowing 1) it was Defendant who had initiated and sought a

9   reclassification and 2) a reclassification would trigger retroactive VAT against NLABS.

10     165. In May 2008, Berrones sent an email to NLABS on behalf of Defendant

11   indicating that the "relabeling conflict" had resulted in COFEPRIS seizing a shipment of

12   HGJ due to EmpresaMex's non-compliance with COFEPRIS' May 30, 2007 resolution

13   requiring that EmpresaMex change HGJ's denomination from "fruit juice" to "dietary

14   supplement."

15     166. Supported by the August 9, 2007 memorandum, Defendant unequivocally knew

16   its subversive efforts to have HGJ reclassified, while benefitting Defendant, would

17   trigger financially catastrophic retroactive VAT and penalties assessed against NLABS.

18     167. Once the VAT exemption for HGJ as a "non-alcoholic beverage" was secured,

19   Defendant dropped NLABS in order to sever itself and HGJ from the inevitable

20   retroactive VAT and penalties it had knowingly triggered against NLABS and its owners,

21   executives, managers and Bird.

22     168. In other words, as early as May 2007 Defendant used NLABS to hedge its bet

23   in having HGJ imported as a "dietary supplement" (with zero VAT assessment) while

24   through fraud, concealment, malice and intentional omission of material facts to all

25   parties involved, attempted to obtain a "fruit juice" reclassification and incentive.

26     169. Once Defendant obtained its objective at any cost, it dropped NLABS leaving

NLABS behind to deal with the retroactive VAT and penalties Defendant had unnecessarily caused through fraud.

170. In simple terms, Defendant used NLABS to hedge its own self-interest by callously allowing NLABS, its owners, employees and shareholders (including Bird) to be irreparably damaged.

171. Based on the foregoing, Defendant knew the statements outlined herein made to Plaintiffs were untrue or made with a reckless disregard for the truth thereof. Further Defendant knew the omissions of fact were material to Plaintiffs.

172. Defendant's untrue statements outlined herein were made with the intent to induce Plaintiffs to rely and act upon such statements to their detriment.

173. Plaintiffs did in fact act in reliance and upon the untrue statements made by Defendant to Plaintiffs' irreparable harm.

174. Defendant's ongoing fraudulent misrepresentations have additionally and foreseeably caused Plaintiffs to incur irreparable damages through lost profits, lost future profits, loss of business, destruction of business, loss of goodwill and loss of business reputation.

175. Defendant's fraudulent misrepresentation(s) have caused Plaintiffs irreparable damage in an amount to be determined at trial not less than $18,381,540 (USD), excluding interest, costs, punitive damages and reasonable attorney fees.

### Claim V

### (Fraudulent Concealment)

176. Plaintiffs incorporate and re-allege paragraphs 1-175 herein.

177. Defendant and its representatives, employees and agents have at all times withheld and concealed their intentional actions to reclassify HGJ as a "fruit juice" to shield itself from legal claims resulting from Defendant's and Mindell's discredited claims regarding HGJ homeopathic and preventative medicine benefits, trademark

1  conflicts as a "dietary supplement," and to capitalize on a (then) new tariff incentive as a

2  "fruit juice."

3  178. As discussed *supra*, when questioned about its conduct, Defendant and its

4  representatives have intentionally misled Plaintiffs into believing that HGJ's tariff

5  reclassification by Customs was an error in which Defendant had no part and that

6  Defendant would work with NLABS in good faith to correct.

7  179. As discussed *supra*, Defendant's concealment of its subversive actions to

8  reclassify HGJ even included requesting NLABS import HGJ under a "dietary

9  supplement" classification knowing full well Defendant had obtained a new tariff

10 classification unbeknownst to NLABS.

11 180. As discussed *supra*, Defendant has further intentionally withheld evidence and

12 documentation from Plaintiffs necessary to defend and restore HGJ's tariff

13 reclassification as a "dietary supplement" culminating in a catastrophic retroactive VAT

14 assessment against NLABS caused by Defendant's fraudulent actions.

15 181. As discussed *supra*, Defendant has further withheld at all times the discredited

16 medical study used by Mindell and Defendant to generally promote and characterize

17 HGJ as a "dietary supplement."

18 182. As discussed *supra*, Plaintiffs within the applicable statute of limitations inquired

19 with Defendant without success to ascertain the facts and evidence giving rise to

20 Plaintiffs' claims herein.

21 183. Plaintiffs have only within the past few months become aware of the facts,

22 evidence, circumstances and causation giving rise to Plaintiffs' claims herein.

23 184. Defendant's above conduct constitutes a knowing and intentional fraudulent

24 concealment of events, evidence and facts fully aware that such concealment would

25 result in aggravated and irreparable financial and reputational harm to Plaintiffs.

26 185. Even after diligent inquiry, the causal connection between Defendant's

- 27 -

1  foregoing unlawful conduct could not have been discovered through independent inquiry

2  because of Defendant's willful and intentional fraudulent concealment.

3  186. Defendant's fraudulent concealment has caused Plaintiffs irreparable and

4  aggravated financial and reputational damage in an amount to be determined at trial not

5  less than $18,381,540 (USD), excluding interest, costs, punitive damages and

6  reasonable attorney fees.

7  **Claim VI**

8  **(Declaratory Judgment Pursuant to 28 USC § 2201)**

9  187. Plaintiffs incorporate and re-allege paragraphs 1-185 herein.

10  188. A controversy exists within this Court's jurisdiction between the Plaintiffs and

11  Defendant concerning the rights and relations among the litigants concerning

12  respondeat superior, joint and several liability and alter ego.

13  189. Defendant has used a surfeit of individuals and entities to accomplish the

14  unlawful conduct outlined herein.

15  190. Such entities participating in the unlawful conduct outlined herein are

16  associated with Defendant through common business identity, ownership, directors,

17  officers, managers, shareholders, facilities, product, brand, capitalization source,

18  purpose, have disregarded corporate formalities and under-capitalized.

19  191. Such individuals participating in the unlawful conduct outlined herein are

20  associated with the entity defendants as their employees and agents.

21  192. Plaintiffs accordingly respectfully request that this Court pursuant to 28 U.S.C. §

22  2201 enter judgment against Defendant declaring as follows:

23      a. FreeLife Mex and EmpresaMex are Defendant's corporate subsidiaries

24      ("Subsidiaries");

25      b. Faltinsky, Fournier, Taffuri and Malley are Defendant's directors, executives

26      and controlling shareholders ("Directors");

- 28 -

    c. Mindell, Zapata, Lopez, Bergman, Berrones, Mendez, Barragán, and Thibaudeau are Defendant's legal agents or employees ("Agents");

    d. Defendant is liable through respondeat superior for the actions of the above Subsidiaries, Directors and Agents actions discovered and deemed to be unlawful;

    e. Defendant through multiple applications to COFEPRIS and Customs in 2007 violated NLABS' right as the exclusive Mexico importer of HGJ;

    f. EmpresaMex and FreeLife Mex are Defendant's international corporate alter egos;

    g. Defendant is the alter ego of Faltinsky, Fournier and Taffuri;

    h. Goji Global, Inc. and FreeLife Inc. are the same company; and

    i. FreeLife International LLC and FreeLife Inc. are the same company.

193. Any statute of limitation otherwise applicable is tolled due to Defendant's fraudulent concealment and resulting futility in discovering a causal connection between Defendant's unlawful conduct and damage to Plaintiffs.

194. Any contractual provision limiting or waiving Defendant's liability or indemnification owed to Plaintiffs is void.

195. Based upon the foregoing, Plaintiffs are entitled to relief as prayed for hereinbelow.

***Prayer for Relief***

WHEREFORE, Plaintiffs are entitled to and pray for relief against Defendant as follows:

    a. Principal damages in an amount not less than $18,381,540 (USD).

    b. Treble or punitive damages for the malicious and egregious nature of Defendant's actions and to ensure such do not occur in the future.

    c. Declaratory judgment as requested herein.

d.  Pre and post-judgment interest at contractual and/or statutory rate(s).

e.  All attorney fees and costs associated with collections, repossession,

defending any action brought by Defendant and filing and maintaining this

action.

f.  Preliminary and permanent injunction to prevent Defendant and its agents from

causing additional irreparable harm to Plaintiffs.

g.  All other relief the Court deems appropriate.

DATED this ___25th___ day of ___September___, 2012.

/s/Aaron K. Johnstun
Aaron K. Johnstun
*Attorneys for Plaintiffs*